Thank you, Your Honor. Bruce Castor on behalf of the United States, Your Honor, I would like to reserve five minutes for rebuttal. Your Honor, perhaps the clearest evidence that the district court erred when it found Mr. Dierking to be in custody comes from the lips of Mr. Dierking as reflected on the recording of the interview and the transcript which we both have been provided. Early on in the interview, Mr. Dierking says to the agents, is this something I could be arrested for? The agents said no. Then Mr. Dierking followed up with the statement, well, what if I told you I hacked the Bank of America? Would you arrest me today? And the answer was no. Why that's important is he's asking the agents, in effect, what can I do prospectively to get arrested here? And they told him nothing. But that indicates if he's asking prospectively what do I have to do, he understands and a reasonable person in his position would understand that he was not under arrest at that point in time. And that followed the entire incident, which makes it clear that this individual was not in custody for purposes of Miranda. From the get-go, when they knocked the announce at the front door and he came out in his boxer-shortened T-shirt, he was told, we're here to execute a search warrant. You're not under arrest. When the agents clear the apartment, we're going to take you inside so you can get dressed and you can leave at any time. They took him inside. The agents got him the clothes he requested. They asked him if he wanted to sit at the kitchen table. He sat at the kitchen table. And at the time that the confession took place, the only agents present with him were the two agents at the kitchen table. There had initially been seven agents, one left for another assignment, two agents at the table, the four other agents within 10 or 15 minutes were back in the bedroom area conducting the search. Mr. Durkin was told on at least six occasions before he confessed, you're not under arrest, we're not going to arrest you today, and if you say today we'll get you arrested, when we're done here, we're going to leave and you're free to go. I think that under the case law and the prior presence of this court, that clearly is not the custodial situation that Miranda is concerned about. This is not a situation where Mr. Durkin was subjected to the kind of either physical intimidation or psychological pressures that were going to overbear his free will and have him confess against his Fifth Amendment rights. And when you compare and contrast the facts of this case to the case that the district court relied on Craighead, the differences are startling. The Craighead court, I think the key to that court was how isolated Mr. Craighead became because in Craighead, as you recall, there were eight agents from three agencies and went to serve a search warrant for child pornography. While the search was being conducted, and all the agents were in flak jackets and armed, while the search was being conducted, the FBI agent and one other agent from another agency escorted Mr. Craighead back to a storage room, closed the door. One of the agents leaned up against the door with his flak jacket and gun on and said nothing, while the other agent told Mr. Craighead, you're not under arrest, you're going to be free to go today, and then interviewed him. The Craighead court found that there was such police domination in that situation that in effect, the otherwise comfortable venue of your own home had become, in effect, I don't believe they used these words, but in effect what they said, this has become a cell for Mr. Durkee. I mean not Mr. Durkee, excuse me, Mr. Craighead. That is so different from the facts of our case that where our individual is not taken back and isolated from anyone, he's, oh and also in Mr. Craighead had an individual there that was brought to the premises to provide moral support, that person was excluded by the agents. No one was excluded from our situation here with Mr. Durkee. The fact that he was there by himself when the agents arrived does not mean that the agents did anything to isolate him. They seized his cell phone, that is true as part of the search warrant, as electronic device under the warrant, but he never asked to use the cell phone. The agents testified they were unaware whether or not there was a hard line or another phone in the premises. They told him numerous times you're not going to be arrested, you're going to be able to leave here when we're done, and they told him at the beginning you can get dressed and you can leave any time you want to. The fact that Mr. Durkee was asking the agents questions I think brings this case, unlike Craighead, much more like the Razzagnini case that was decided after Craighead. And when this court found that a two and a half hour interview in a conference room where the defendant had been ordered to leave his computer, told by his HR director to proceed to the conference room, told the agents give us your keys because if you don't give us your keys we're going to have to break into your car, and we had a two and a half hour interview. At one point the defendant in Razzagnini said, is this where I should be getting a lawyer? And the agents said, well if it was me I wouldn't because you're not under arrest yet, but that's up to you. Under all those facts, which are much more coercive than the facts of our case, this court found and reversed the district court, that was not custody from rent. Absent any further questions, Your Honor. I think you've covered it. Thank you. Thank you. Good morning. Good morning, Your Honors. My name is Ben Coleman. I represent Mr. Dierking, the appellee. The government sort of seizes on a few facts that they like, yet don't really address Craighead and the test that this court set forth in Craighead. And I'll get to that test in just a moment. In addition, they tend to rely on cases like Bassignani, which we just discussed, which are not in-home interrogations. And the whole point of Craighead is that this court made it clear that for interrogations that are conducted within the home, we're going to take a different analytical approach than to interrogations that are conducted outside the home. In Bassignani it was at a workplace. And this court has a five-factor test that governs interrogations that are conducted outside the home. It's articulated a different four-factor test to govern interrogations that are conducted in the home. And that is the binding precedent of this court, and the government doesn't want to address that four-factor test because under that test, as the district court found, there was custody in this situation. The four factors are, number one, the number of law enforcement personnel present and whether they were armed. In this case, there were seven FBI agents, all armed. When they initially approached the home, they had their weapons unholstered. They had a battering ram. They were wearing flak jackets. This was, if anything, this was more of a police-dominated situation than in Craighead. There's no question, and the government doesn't dispute today, they never disputed in their briefs, nor do they dispute below that the first factor weighs in favor of an in-custody finding. The second factor is restraint. In this case, the agents ordered Mr. Dierking, who was in his underwear and was awakened at 6.50 in the morning from his sleep, outside of his home, so he had to stand outside of his home for several minutes in nothing but his underwear. And it's at that time that the government claims that he was informed that he was free to leave. It's the only time he was ever told you're free to leave. The district court was, I think, a little bit frustrated that that supposed advice was not captured on the recording, nor was it included in the FBI 302 report. But the district court seemed to credit that that statement was made. But what the district court found was who at that time, at 6.50 in the morning, dressed in nothing but their underwear, without shoes, socks, car keys, anything, where are they going to go? Telling someone they're free to leave is... Okay, let's take that as a given for a second. He didn't make any statements then, did he? The questioning didn't start then. No, the questioning started about, I would say, probably eight to ten minutes later. Okay, that's when he's back in the house. Correct. He's got his pants on. Right? They gave him pants. They wouldn't let him dress himself. He couldn't take them off. You want to quibble about it? I mean, he got his pants on, right? Yeah. When they're talking to him. Okay, so he's got his pants on. He's not in an isolated room. He's in the kitchen table. Is that right? Well, I don't know what you mean by an isolated room. He's in there. Well, it wasn't in a storage room as in Craighead. No, this was a small apartment. There was no... He was at the kitchen table? Correct. He was told that he was not going to be arrested that day. Not initially. That's not what he was told. They sit down and they start to interrogate him. And he says, you know what, I'm afraid here. And then they say, oh, well, let's slow it down a little bit. And then they continue to interrogate him. Did they tell him at some point he's not going to be arrested? They did tell him at some point he wasn't going to be arrested. Craighead was also told he wasn't going to be arrested. How many times did they tell your guy that he would not be arrested? There is essentially one dialogue when he's saying, I think I want to get a lawyer now. I'm afraid I should talk to a lawyer. And at that point, there's the dialogue about you're not going to be arrested this day regardless of what you say. And there's a back and forth about that. And the point that counsel made about his asking what would I have to say to get myself arrested, doesn't that? I don't mean those are the exact words, but there is that conversation, well, what if I tell you if I hacked the Bank of America or something like that? That conversation does go on. What was the second part of his sentence? What if I tell you how did that happen? I think he said, well, if you tell us that you murdered somebody who was a dead body in the closet, we would arrest you today. Isn't that a pretty good insight into his understanding that he was not yet arrested or he was not arrested? Well, again, we have to use the term arrest. I mean, it's clear that he wasn't going to be taken down to the FBI office that day. And that's clear. Craighead, it was the same thing. They told him, look, it doesn't matter what you tell us today, we're not going to arrest you. We're not taking you down to the FBI office. They claim that this case is startlingly different from Craighead. It's the exact same thing. The officers told Craighead the exact same thing that Mr. Dierkin was told. And this court still found that the defendant was in custody. But the situation in this case is actually worse than in Craighead. Craighead wasn't ordered out of his house in his underwear at gunpoint. It wasn't 6.50 in the morning when he had just – Craighead hadn't just awoken. Craighead wasn't prohibited from getting the clothes of his choice or to go ahead and take a shower and brush his teeth, what you would normally do at the first part of the day. Craighead wasn't – none of that stuff happened to Craighead. This all happened to Mr. Dierkin. So this situation was worse. So if you want to look at the restraint factor, the restraint factor was worse in this case than it was in Craighead. As far as isolation, the government claims, well, the agents didn't intentionally try to isolate Mr. Dierkin. Well, it doesn't matter what the agents intended. Their intent is not the analysis. The analysis is what did Mr. Dierkin himself – what would a reasonable person in Mr. Dierkin's shoes – would they feel isolated? And of course they would. It's 6.50 in the morning. They seized his only cell phone. He's home all alone. Who is he going to call? Who is he going to speak to? And what makes it worse, you know what did not happen in Craighead? Craighead never asked to speak to a lawyer or expressed a desire to speak to a lawyer. And they told him he could have a lawyer if he wanted it. But Mr. Dierkin – but what was he going to do? If he took his cell phone, it's 6.50 in the morning. Couldn't he say, could I have a phone to call one? Presumably he could have, but he didn't. But he didn't have the ability to do so. And the question is, would you feel isolated? Would you, being home all alone at 6.50 in the morning when a team of seven agents come into your home, storm your home with guns drawn and a battering ram, your only phone is taken, would you feel isolated? I think most people would feel isolated. Maybe at 6.50 a.m. and you're outside in your underwear if they had started interrogating him. But that isn't what happened. They didn't ask him any questions until he was dressed, he was seated at the kitchen table. The other officers were not sort of looming over him. They were in a separate part of the house. Can we take – I mean, there was a passage of time. And then your client asked some very cogent questions about what's going to happen to me and if I talk to you, will I get arrested? If I tell you I did something really bad, will I get arrested? And after he clarified that he wasn't getting arrested, I mean, don't those show that he was – he understood that he wasn't in custody? I don't believe so. The issue was not whether you understood whether you were going to be arrested and brought down to the FBI office that day. The issue was whether there were significant restraints on your freedom and whether you would feel free to leave. No one ever told him that you're free to go, you don't have to answer our questions. You can go ahead and leave us. He wasn't told that at the time of the interrogation. The only time that supposedly he was told he was free to leave, which again is not captured on the recording, is when he was outside in his underwear and nothing else without any ability to leave. The issue isn't simply – and this goes back again to Craighead. Craighead was told the exact same thing. It doesn't matter what you tell us today, you're not going to be arrested. And this court, from the question, seems to be focusing on that one thing. But the exact same thing was done in Craighead. And this court still found that he was in custody. And that's what the district court in its reasoning said. Look, in Craighead, the defendant was told no matter what you tell us today, you're not going to get arrested. But this court still found that it was custody, given the police-dominated atmosphere of the home, given the fact that Craighead was alone, given the fact that Craighead couldn't move freely in his home. It's the same thing with Mr. Gierke. They wouldn't let him get dressed for himself. He couldn't go ahead and take a shower and brush his teeth and go ahead and leave. He would have to, I guess, presumably strip down naked and have officers observing him as he took a shower and got ready to leave the home. I mean, nobody would feel free to leave, and that's the point. So to the extent that the government heavily relies upon, and the court seems to be grasping on this issue that he was told he's not going to be formally booked and processed and arrested that day, it's not different from Craighead. It's the exact same thing that happened in Craighead. So if this court is going to say, well, in this case, that means he wasn't in custody, then there's a conflict with Craighead, because Craighead was told the exact same thing. It's our position that the situation, frankly, in this case, was worse. At least Craighead had somebody on the premises for support. Craighead was, I think, the search took place more like at 9 a.m. It wasn't at 6.58 a.m. Craighead wasn't awoken from his sleep with guns drawn in nothing but his underwear. And really what the government wants in this case is they want to have their cake and eat it, too. They want to be able to, with a, this is a computer hacking case. It's not a drug case. It's not a case of organized crime or a weapons case where there's really a lot of reason to fear that the person is armed and dangerous. They've been conducting surveillance of Mr. Durkee for a little while. They know his background. They know what he's done for work. But what they want to do is they want to come in. They know he lives alone. They want to come in with seven agents with their guns drawn. They want to order him out of his house in his underwear. They want to put this pressure on him. They want to tell him, and Craighead wasn't told that there was significant evidence that he had against him. Craighead wasn't told that if he lies to them, he could be charged with a felony, that Martha Stewart went to jail for lying. Craighead wasn't told any of those things. The coercive nature and the interrogation techniques that they put on Mr. Durkee were much more, they were much more sophisticated and much more. There's no claim that the statement was involuntary, is that right? No. We're claiming that the district court ruled that he was in custody for Miranda purposes. But all this. Yeah, but all this stuff you're talking about, there's no claim here that his will was overborne, that it was involuntary, that he was coerced. No, but it is relevant for the custody determination because in the United States v. Kim and several other cases, and in the traditional five-factor test that this court considers for custody, this court considers whether the defendant is confronted with evidence of his guilt. And in this case, what they did is they said, look, we've got a real solid case against you. We've been tracing, we've been doing runs on computers for quite some time. Everything leads to you. That's why we've gotten a search warrant. We've got a real solid case. You're looking at a serious felony. He carries five years in prison. You can't lie to us. If you lie to us, you'll go to jail just for lying, and that's what happened to Martha Stewart. They do all these things, and that is factors that are indicative of custody. None of that happened to Craighead, and this court still found that Craighead was in custody. It's our position that if there are any differences, it's worse. It's in our favor that the situation here is more indicative of custody than Craighead was. So, but what I was getting back to is the government wants to have their tape and need it too. They want to be able to come in and show a force in a situation where really there wasn't a need for all this force. Now, they have the right, and I understand safety concerns, and if the FBI wants to go in like that, they have the right to do that. But this isn't the type of case that you would think someone's going to come out with guns blazing. But they want to make it sort of a restrictive atmosphere for the defendant. They want to put, or the suspect, I should say, they want to put the pressure on them, but then they don't want to give them a random warning. And it's a simple thing. Why can't they just give them the random warnings? And, of course, if he had in this case, the overwhelming likelihood is that Mr. Durkin would have said, well, I'd choose to remain silent. He indicated on three occasions that he wanted to speak with a lawyer. He thought he should speak with a lawyer. So, I mean, it's not that big of a deal, and that's what this court said in Craighead, and that's what the First Circuit said in Mattel-Carrie, is if you're in this situation, just give them the random warnings. And if the defendant invokes, they invoke, and then there's not this problem. And if they waive their rights, then we're not here talking about suppressions and statements. But they want to have their cake and eat it, too. They want to come in and create this atmosphere, and then they want to interrogate without giving the warnings. We also have a jurisdictional question. There were no comments about that in the Governor's opening remarks, if there were no questions. I was simply going to say that I believe, Judge Silverman, you wrote the Wallace decision, and in that decision you indicated that if somebody other than the United States Attorney is going to certify an appeal under Section 3731, that you should give the documentation to support the fact that you have the authority to do so. It was the very same U.S. Attorney's Office that is handling this case. In that case, like this case, they belatedly came up with it. They belatedly came up with it. But what's more is that just a few months before they filed the appeal in this case, this court had decided way rock, where this court had said that, look, you're not treating this seriously. We've told you over and over again you need to have the proper people certifying, and you need to demonstrate that they're the proper people certifying, and we're not going to tolerate this in the future. And just a couple months after that, the government, again, they don't do what this court has warned them that they should be doing over and over again. So this court, it's our position that, look, enough is enough. The time is they're never going to pay attention if there's never any sanction for it. It's finally time to say we're going to dismiss this appeal. You didn't do what we told you to do over and over again, and the time has come for dismissing. You know, whether they have a meritorious appeal or a non-meritorious appeal, it doesn't seem like that's a just way to dispose of it, though. It does not? It does not seem to me to be a just way to dispose of it, to dismiss the appeal without getting to the merits after they have corrected the problem. Well, I guess justice is in the eye of the beholder. To me, if nothing is ever done, then they should be cited for contempt. I mean, there are other ways to skin the cat, but it just doesn't strike me that dismissing the appeal is the preferable remedy. Well, I do know that in W.R. Grace, this court's unbanked decision, this court indicated that an appropriate remedy is dismissal of the case. That's what this court has said. It's never said that contempt is an appropriate remedy, and I wouldn't want any of my colleagues held in contempt for something like this, but it seems that what this court has set forth as the appropriate remedy is dismissal. And, you know, that happens all the time. People have meritorious claims. They don't file within the statute of limitations. I'm sorry. You didn't do it in time. You lose. It may not be just. I mean, that's jurisdictional. This isn't. Well, this is quasi-jurisdictional in the sense that it's not jurisdictional. We have a case that says it's not jurisdictional. Right. It's not jurisdictional, but it is a the court can dismiss for failure to comply with the statute that gives them jurisdiction. Thank you, Mr. Coleman. Thank you. What do we have to do to get you folks to certify the appeals the way we want them certified? Your Honor, let me address that right off the bat. You know, we had a good belief that what we did in this case was a proper certification. Here's why. You know, we had a certification signed under a declaration of penalty of perjury. I, Kevin J. Kelly, is the acting U.S. attorney, and I certify as acting U.S. attorney the following things that we need to certify, and sign, again, under declaration of penalty of perjury, acting U.S. attorney. In our mind, under the CFR, acting U.S. attorney is a position within the Department of Justice that conveys upon that person the authority to sign on behalf of the U.S. attorney. It's totally unlike RYREC. In RYREC, the person made an attempt to make an oral certification. Then when this court went for their attention, they tried to make a certification by a trial attorney with no reference to being the acting U.S. attorney, and ultimately they had to get the attorney general to certify it. But realizing that when we got Mr. Coleman's brief that maybe, you know, our view of the law and what acting U.S. attorney means is still causing a problem and an issue, we've instituted, since I'm chief of the appellate section, I instituted another template for our appeals. When we file government appeals, we have a template for a sentencing appeal. We have a template for a 3731 appeal. And now we have a third template, 3731 appeal, signed by the acting, which is going to contain the documentation in the original certification and not assume that acting U.S. attorney conveys the same meaning to the court that it does to us. One of the problems that I see is that anybody can go look in the official record and find out who the U.S. attorney is in the Southern District of California. That is true. We don't know from day to day whether there's an acting U.S. attorney or not. That's a good point, Your Honor. So that's part of the problem. That's a well-taken point. You know, we just didn't think of that. And I apologize for taking the court's time on this. It's not going to happen again because we've changed it. It's not that we weren't listening. We may have misunderstood, but we are making a good-faith attempt to comply with the requirements of 3731. And it's unlike Wallace because in Wallace, the person who did sign the declaration did not say in the declaration, I'm acting as acting U.S. attorney. He said I was acting as first assistant. He signed first assistant acting U.S. attorney. But in the declaration, he did not say I'm acting U.S. attorney and I certify as acting U.S. attorney to follow. What about the other point Mr. Coleman made, that this case is more like Craighead than you're willing to admit? I think that's totally incorrect. I think that this case couldn't be more. This is a standard search warrant case. I was thinking as we were sitting here today. Is it standard to have seven FBI agents, guns drawn, and a battering ram for a computer hacker search? Well, it's an interesting point. One, there were five agents at the door and two at the back. So there were five agents at the door with their guns drawn. That is standard. In my personal opinion, I've been doing this job for 35 years, the most dangerous, scary, and important thing we do is authorize and the agents execute search warrants. I think that's the most dangerous and most intrusive and the most important thing we do because bad things can happen. And the only way to make sure bad things don't happen is for the agents to take immediate control, make sure everybody's safe, and then do like the agents in this case did, take down their flak jackets, put their guns away, move on to do the search, and remove that kind of pressure. And I will say that the fact that it's a computer hacking case I think should be irrelevant because just last week our offices authorized a search warrant for a child porn case. The agents went to execute the warrant. They knocked and announced. No one answered. They broke in. The individual there was lying on the floor, had a gun, and fired a shot. That was a computer hacking case. You never know what you're going to get when you execute any search warrant. I think it's irrelevant that we're searching for either drugs or a computer. I mean, you can have a situation where you're searching a gangbanger's house and they're known violent criminals and they're known for shooting and resisting arrest. That's a SWAT team situation. I understand that. What I'm saying is no matter what search warrant you're executing, you need to take control for everyone's safety, make sure there's no one in there, there's no guns in there, nothing bad's going to happen. That's what those agents did. And then they stood down. They took off their jackets. They took their jackets and went out. They put their guns away. Four of them were back searching. Only two of them were talking to this individual when he made his statement. Totally unlike Craighead where Craighead, the defendant, took the stand and testified, look, I'm in this little room. The door is closed. One guy's leaning up against it with his flat jacket and his gun on to me guarding the door. I'm going to guard it basically cell. When they told me I was free to leave, I didn't believe him because I didn't know there were two other agencies out there conducting this search, and I didn't think she spoke for them. They did exclude a person that was there for his moral support. None of that happened here. It's not excluding someone. It's not like the Kim case that Mr. Coleman referred to. In Kim, the defendant, a native Korean speaker whose English was not that good, arrived at their store with their husband. The agents took Mrs. Kim into their store to interrogate her, I think, for two or three hours, intentionally excluding her husband and another relative. That's isolation. If someone had come to the door and said, hey, can I sit in? They said, no, you can't be here. That's isolation. The fact that we show up at your house and you're by yourself, we haven't isolated you. He didn't ask to call anybody. We told him you could leave. We told him you're not under arrest. And to a layperson, being told you're not under arrest, I mean, it's not substantial. How can you tell somebody you can leave if you put them outside in their underwear? What they said is, we're going to take you inside, get you dressed, and you can leave at any time. They knocked on the door, knocked on the door. He came and answered the door. He said, step outside. The three other agents said, yes, we're in the front door because there's two in the back. They're outside for eight minutes. During this eight minutes, they said, we're here to execute a search warrant. You're not under arrest. Our goal is when we get the room, the apartment cleared, we're going to take you inside so you can get dressed and you can leave at any time. I mean, a reasonable-minded person would believe, okay, I can go inside, get dressed, and I can leave. The fact that you might want to stay and see what's going on, the fact that you might want to talk to the agents to see what this is all about, the fact that you want to see what they're doing with your property, that is not coercive on the agents' part. That's your individual position. And to say that Craig had us create a new separate test for the home, that's also incorrect. There is no special test because you're in your home. There's no special test because you're on the side of the highway. There's no special test because you're in your office. It's the same test. Were you under formal arrest or its functional equivalent? Now, the location of the interview is a factor to be considered. And usually the fact that you're in your house is a factor weighing against custody. Craighead was a very unique case. I'm aware of no other case like Craighead where you're told you're free to leave and you're in your own home and you're in custody, but it was because the person really was in a cell within his house the way the facts went down in that case. This is much more like Bazzalany and less coercive than Bazzalany. This was not a situation where he was pressured or intimidated or confronted in the sense of they challenged him about his statements. That's what confronting someone means. You challenge him. You say, I didn't do it. Oh, yeah, we know you did it. That didn't happen here. This is a very low-key conversation, as we say in our brief, and you can hear on the CD there's some laughter involved before the confession takes place. And so going back to my point, what do you tell the agents the messages from this decision? Other than the fact that the individual was in his underwear when they arrived, this was a standard case. They secured the place, then they stood down. He's at his kitchen table, and even Craighead indicated at the end of the appearance that it might be a different story if he was at the kitchen table and not this little closed room with a guard guarding the door. We didn't have that. They told him you're not going to be arrested today. I mean, what else would they do to make this non-custodial in a search warrant situation? I think what Mr. Coleman is asking for today is a rule from this court basically saying if you're executing a search warrant, you need the Miranda's. This court rejected that position over 30, almost 40 years ago in Beskowitz. When that same claim was made, they went to search the house for a fugitive pursuant to a search warrant. This court rejected that claim, said no, that's one factor to be considered, and then applied, you know, five or six other factors to determine whether or not there was custody in that case. We would ask this court to look at the facts of the totality, to apply the correct test, which is not whether it's police domination or whether you're free to leave. The correct test is were you under arrest or its functional equivalent, and find that the district court erred, and we'd ask this court to reverse the district  Thank you. Thank you for your time, Your Honor. The case just argued is submitted. Thank you very much to both counsels. Final case is 0855838, Federal Trade Commission v. McGregor. Fifteen minutes for each side.
judges: Bolton, Thompson, Silverman